**UNITED STATES BANKRUPTCY COURT**　　　　FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------:
　　　　　　　　　　　　　　　　　　　　　　　:　　Chapter 11
In re:　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　Case No. 08-10152 (JMP)
QUEBECOR WORLD (USA) INC., *et al.*,　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　(Jointly Administered)
　　　　　　　　　　　Debtors.　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
-----------------------------------------------------------------:
　　　　　　　　　　　　　　　　　　　　　　　:
OFFICIAL COMMITTEE OF UNSECURED　　　　:
CREDITORS OF QUEBECOR WORLD (USA)　　:
INC., *et al.*,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　Adversary Proceeding
　　　　　　　　　　　Plaintiff,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　　No. 08-01417 (JMP)
-against-　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
AMERICAN UNITED LIFE INSURANCE　　　　:
COMPANY, *et al.*,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Defendants.　　　　　　　:
-----------------------------------------------------------------:

### MEMORANDUM DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BINGHAM MCCUTCHEN, LLP
*Attorneys for the Movants/Defendants*
399 Park Avenue
New York, New York 10022

　　　　Joshua Dorchak, Esq.
　　　　Dina R. Kaufman, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for the Plaintiff*
65 Livingston Avenue
Roseland, New Jersey 07068

　　　　John K. Sherwood, Esq.
　　　　Jason Halper, Esq.

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

Defendants in their motion for summary judgment (the "Motion") contend that prepetition payments totaling approximately $376 million received from Quebecor World (USA) Inc. ("QWUSA", and with its various debtor and non-debtor affiliates, "Quebecor") during the preference period are exempt from avoidance as a matter of law by virtue of section 546(e) of title 11 of the United States Code (the "Code"). The question presented calls for examination of this "safe harbor" provision with particular emphasis on the proper application of the term "settlement payment" as defined in section 741(8) of the Code[1] when used in reference to a repurchase and subsequent cancellation of privately-placed notes.

Deciding this question requires careful consideration of the recent opinion of the Court of Appeals for the Second Circuit in *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, __F. 3d __, 2011 WL 2536101 (2d Cir. June 28, 2011) ("*Enron*").[2] Judge Walker, writing for the *Enron* majority, concluded that prepetition payments made by Enron to redeem its commercial paper prior to maturity constituted "settlement payments" within the meaning of the safe harbor of section 546(e). By looking to the statute's plain language, the opinion concludes that payments made to redeem

---

[1] The definition itself is not particularly helpful and brings to mind Gertrude Stein's often quoted tautological reference to the essential nature of a rose. It provides as follows: "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). In short, a "settlement payment" is a settlement payment.

[2] *Enron* was issued on June 28, 2011 following the completion of briefing and argument on the Motion.

commercial paper constitute the transfer of cash made to complete a securities transaction and thus are protected settlement payments as defined in section 741(8). In a separate dissenting opinion, Judge Koeltl disagreed with the majority, observing that the holding is not required by the opaque definition of "settlement payment" in section 741(8) and that the breadth of the decision potentially could threaten routine avoidance proceedings.

The matter before the Court is an example of litigation that, as Judge Koeltl anticipated in his dissent, is threatened due to the broad impact of this controlling precedent. As a result of the guidance provided by the *Enron* decision, the Court no longer needs to evaluate conflicting testimony regarding usage of the term "settlement payment" within the private placement sector of the securities industry or to decide whether the prepetition transfers of value to the defendants should be characterized as a redemption of private placement notes rather than a repurchase.

That distinction, to the extent it once had significance, no longer matters, and the analytical task for the Court has been simplified by precedent making clear that the transfers at issue in this litigation fit the statutory definition of settlement payments and may not be avoided. For the reasons stated in this decision, the prepetition payments made to the defendants are settlement payments that qualify for safe harbor treatment under section 546(e) of the Code because they involve a transfer of cash to complete a securities transaction, and the defendants, therefore, are entitled to entry of summary judgment in their favor.

### *Preliminary observations regarding immunity from preference exposure under section 546(e)*

The "safe harbor" sections of the Code were enacted to exempt certain specified financial contracts from the reach of the automatic stay and the avoidance powers of the

Code.  These immunities are intended to contain the spread of economic contagion and

protect the markets from systemic risk.  The safe harbors, including the settlement

payment exemption that is the focus of this decision, are a means to override bankruptcy

remedies that ordinarily would be used to pursue the recovery of prepetition payments

that are exposed to preference risk.  As a policy matter, Congress has declared that when

the securities markets are involved, it is better not to disturb certain prepetition transfers

than it is to collect assets for equitable distribution to creditors.

This litigation illustrates the tension that exists between an exemption that

promises full immunity from preference exposure for settlement payments and the

broader objective of the Code to collect assets for the benefit of all unsecured creditors.

The ability to avoid such payments is ingrained in the notion of fairness in bankruptcy.

The pursuit of preference litigation is an established mechanism to add value to the estate

and to equalize recoveries among similarly-situated creditors by redistributing the

recovered payments to creditors within the same class.

The complaint in this adversary proceeding brought by the Official Committee of

Unsecured Creditors of Quebecor World (USA) Inc. (the "Committee" or "Plaintiff")

seeks to recover approximately $376 million paid to the defendant institutional holders

(the "Noteholders" or "Defendants") of private placement notes (the "Notes").  It is

undisputed that these substantial payments were made by QWUSA to the Noteholders on

October 29, 2007 within the ninety-day period before the date that Quebecor's Canadian

affiliates commenced insolvency proceedings in the Superior Court of Quebec and

QWUSA and its U.S. subsidiaries filed companion chapter 11 cases in the Southern

District of New York.  The Defendants deny any liability to return the prepetition

payments and claim total immunity from all preference exposure under the authority of section 546(e).

Interestingly, neither Quebecor nor the Noteholders appears to have relied on the existence of safe harbors in structuring either their original Note purchase transaction or the transaction that resulted in the repurchase of the Notes.[3]  This started as a relatively routine private financing transaction in which the Noteholders advanced unsecured credit to Quebecor under terms of a note purchase agreement.  Years later, at a time when Quebecor's financial condition had deteriorated, the Noteholders agreed to work together in their shared economic interest, demanded and accepted payments that even included a "make-whole" amount in consideration of cancellation of their Notes and then went through a period of watchful waiting after receiving payment in full from Quebecor.  The safe harbor defense appears to have been identified only after the fact in anticipation of litigation.  Thus, the situation presented here is an example of behavior that the law generally would seek to discourage (ganging up on a vulnerable borrower to obtain clearly preferential treatment in the months leading up to a bankruptcy) rather than reward with the grant of complete immunity from having to return any portion of payments that are exposed to preference challenges.

Similarly situated creditors represented by the Committee have participated in the bankruptcy process and have been relegated to percentage distributions from Quebecor under a confirmed plan of reorganization amounting to only a fraction of their allowed

---

[3] Certain of the safe harbors are geared to specific financial contracts (for example, a repurchase agreement or a swap agreement).  Parties to such contracts know at the time of entering into them that the subject transactions are covered by an applicable safe harbor and are protected from bankruptcy risks.  Such agreements are structured and priced with that immunity in mind.

claims while the Noteholders have reaped the benefits of an unimpaired total return.  It is only natural that the Committee seeks to restore the now-disputed payments to the estate.

Purely from an equitable perspective, the disparity in relative recoveries between the Noteholders and Quebecor's other creditors almost cries out for a remedy *unless* the payments fall within an appropriately more favored category of transfers that logically fits the definition of settlement payments under the Code.  *Enron* clarifies the process of classifying these payments and compels the conclusion that the payments made by Quebecor on the private placement Notes are substantially the same as the redemption payments that were found to be settlement payments in *Enron.*

The Committee tries hard to distinguish what has become indistinguishable as a result of the holding of the majority opinion in *Enron*.  Certainly there are some differences.  The repurchase of the private placement Notes by QWUSA was rather informal from a settlement perspective, especially when compared with a typical trade of public securities that clears through the Depository Trust Company (the "DTC") in which cash is paid for securities as part of a substantially simultaneous exchange of value.

The repurchase or redemption of the Notes was different and involved unilateral payments made by QWUSA to all of the Noteholders in consideration of their return of the Notes for cancellation at some point thereafter.  The arrangements lacked a strict settlement protocol for ensuring that the Notes were being delivered in a timely and disciplined manner as a condition to receiving payment.  Payments were made by QWUSA on the same date directly to a financial institution that was acting as agent for the Noteholders without passing through the DTC or any other clearing agency while the Notes were delivered later, in certain instances weeks or months later.

As the Committee's expert witness has explained, settlement risk relating to the exchange of cash for securities was not part of the transaction because each of the Noteholders received its payments directly and simultaneously without attention to the timing of delivery of the Notes that were being repurchased by QWUSA.  That explanation, however, is not part of the definition of settlement payment under *Enron* and has been neutralized as a distinguishing characteristic by that holding.

The transactional differences are worth noting but are only of marginal importance.  They are variations in the details of the settlement process that distinguish the note repurchase and cancellation procedures followed in Quebecor from the open market redemption of commercial paper in *Enron*, but these are distinctions without a real difference in light of the holding of the *Enron* majority that focuses on the generally applicable statutory language rather than specific procedures that may be involved in a particular securities transaction.

The majority opinion leaves no room for doubt that the payments made to the Noteholders are settlement payments because, consistent with the plain language of the Code, they involve the transfer of cash to complete a securities transaction.  The test has become quite simple and all-encompassing and does not lend itself easily to the formulation of nuanced exceptions.  In this instance, the transaction was completed by the payment of cash followed by the delivery of securities rather than by means of a simultaneous exchange of cash for securities. That timing difference does not alter the fundamental character of what inescapably is a securities transaction.  As explained in more detail in the following sections, the transfers in question are settlement payments protected under section 546(e) and may not be avoided.

*Relevant Facts and Procedural History*

Quebecor was at one time the second-largest commercial printing business in North America.  *See* Declaration of Dina R. Kaufman in Support of Defendants' Motion for Summary Judgment, dated Nov. 1, 2010, Adv. Pro. 08-01417, ECF Nos. 36-41 (together, the "Kaufman Decl."), Ex. C1 (Declaration of Jeremy Roberts Pursuant To Local Bankruptcy Rule 1007-2 and in Support of the Debtors' Petitions and First Day Motions) ¶¶ 7, 9.  QWUSA was the company's principal subsidiary in the United States.  *Id.* ¶ 8.  QWUSA oversaw cash management, operations, and employee matters for Quebecor's printing facilities in the United States.  *Id*.

## I.   *Issuance of the Notes*

In July 2000, another Quebecor entity, Quebecor World Capital Corp. ("QWCC") raised $371 million by issuing a series of private notes comprised of (i) $175 million in Series A senior notes and $75 million in Series B senior notes issued pursuant to that certain Note Purchase Agreement dated July 12, 2000, and (ii) $91 million in Series C senior notes and $30 million in Series D senior notes pursuant to that certain Note Purchase Agreement dated September 12, 2000 (together, the Series A, B, C and D notes constitute the Notes).  *See* Kaufman Decl. Ex. A1 (July 12, 2000 Note Purchase Agreement), Ex. A2 (September 12, 2000 Note Purchase Agreement) (together, the "Note Purchase Agreement").  The Notes were issued through a private placement to a group composed primarily of insurance company investors.  The $371 million raised by the issuance of the Notes was transferred within the Quebecor corporate family, with the funds ultimately being advanced to QWUSA.  *See* Kaufman Decl. Ex. C2 (Ernst & Young, Inc., 11th Report of the Monitor, dated July 21, 2008) ¶ 93.  QWUSA and

Quebecor World Inc. ("QWI") guaranteed the payment obligations under the Notes.  *See*
Note Purchase Agreement § 2.2.

Several provisions of the Note Purchase Agreement are relevant to this litigation.
Most critically, section 8.2 permits QWCC to prepay all or part of the Notes at any time
for any reason.  *See* Note Purchase Agreement § 8.2 ("Upon notice as provided below,
the Company shall have the privilege at any time and from time to time of prepaying all
or any part of the Notes … ").  Section 8.6 appears to permit an affiliate of QWCC to
"purchase, redeem, [or] prepay" the Notes from the Noteholders.  *See id.* § 8.6 ("The
Parent Corporation will not and will not permit any Affiliate … to purchase, redeem,
prepay … any series of the outstanding Notes … except (a) upon the payment or
prepayment of each series of the Notes in accordance with the terms of this
Agreement…").  Section 8.7, in turn, defines the make-whole premium (the "Make-
Whole Premium") to be paid to the Noteholders in connection with a prepayment of the
Notes under section 8.2.  *See id.* § 8.7 ("The term 'Make-Whole Amount' means, with
respect to any Note, an amount equal to the excess, if any, of the Discounted Value of the
Remaining Scheduled Payments with respect to the Called Principal of such Note over
the amount of such Called Principal …").  Following such a prepayment, section 8.5
provides that "[a]ny Note paid or prepaid in full shall be surrendered to the Company and
cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid
principal amount of any Note." *Id.* § 8.5.  Section 11.4 recognized the possibility that a
prepayment could be avoided under the Code as a preferential transfer.  *See id.* § 11.4
("[should a payment on the notes be] subsequently … declared to be fraudulent or
preferential … the obligation … shall be revived and continued in full force and effect

with respect to [QWI's] obligations hereunder, as if said payment had not been made

…").

　　　Importantly, the Note Purchase Agreement contains a negative covenant that

QWI, as the parent company of QWUSA and QWCC, would not permit its quarter-end

debt-to-capitalization ratio to exceed 55% after December 31, 2000 (the "Capitalization

Covenant").  *See id.* § 10.1 ("*Leverage Ratio*. (a) [Subject to exception], the Parent

Corporation will not at any time permit the ratio of Consolidated Indebtedness to

Consolidated Total Capitalization to exceed … (ii) .55 to 1.00 as of the last day of any

fiscal quarter ending after December 31, 2000") (italics in original).  Section 12, in turn,

provides that a breach of the Capitalization Covenant constitutes an event of default

under the Note Purchase Agreement.  *Id.* § 12(c) ("An '*Event of Default*' shall exist if any

of the following conditions or events shall occur and be continuing: … (c) the Parent

Corporation defaults in the performance of or compliance with any term contained in

[s]ections 10.1 through 10.4 … ") (italics in original).  Section 13 provides that an event

of default arising from a breach of the Capitalization Covenant[4] could render the Notes

---

[4] Some confusion exists as to whether a breach of the Capitalization Covenant would
have immediately accelerated the maturity of the Notes or would have simply permitted
the Noteholders to declare an early maturity.  Notwithstanding the plain language of
sections 12 and 13 of the Note Purchase Agreement, Quebecor and the Committee's
counsel interpret the Note Purchase Agreement to provide that a breach of the
Capitalization Covenant would have immediately accelerated the maturity of the Notes.
*See, e.g.,* Declaration of Erin S. Levin In Opp. To Defendants' Mot. For Summary
Judgment, dated Nov. 23, 2010, Adv. Pro. 08-01417, ECF No. 60 ("the "Levin Decl.") Ex.
9 (Internal Quebecor Mem. dated June 29, 2007) ("A breach of [the Capitalization
Covenant] ***would trigger immediate repayment*** of the $316.5M …") (emphasis added);
Plaintiff's Mem. of Law In Opp'n to Defendants' Mot. for Summary Judgment, dated
Nov. 23, 2010, Adv. Pro. 08-01417, ECF No. 60 (the "Response") ("The debt-to-
capitalization covenant was critical because section 13 of the Note Purchase Agreements
provided that if QWI breached the covenant, then all of the outstanding Private Notes…
***would be immediately due and owing*** to the Noteholders") (emphasis added).  The

immediately due and owing to the Noteholders.  *Id.* § 13.1(b) ("*Acceleration* … (b)  If

any other Event of Default has occurred and is continuing, any holder or holders of more

than 50% in principal amount of the Notes at the time outstanding may at any time at its

or their option … declare all the Notes then outstanding to be immediately due and

payable") (italics in original).

## II.     *The Disputed Transfer*

QWI and QWUSA were borrowers under a credit agreement with a syndicate of

banks as lenders and Royal Bank of Canada as Administrative Agent for a revolving

credit facility in the aggregate amount of $1 billion.  *See* Kaufman Decl. Ex. A3

(Amended and Restated Credit Agreement, dated as of Dec. 15, 2005) (as amended, the

"Credit Agreement").  Among its other provisions, the Credit Agreement contains a

"cross-default" provision providing that acceleration of the maturity of the Notes arising

from a breach of the Capitalization Covenant in the Note Purchase Agreement would

constitute a breach of the Credit Agreement.  *See* Credit Agreement § 15.1.8 (the "Cross-

Default Provision").  Because of the Cross-Default Provision, the Noteholders were able

to exercise considerable leverage as Quebecor's financial condition worsened in mid-

2007, and, due to an impending breach of the Capitalization Covenant in the Note

Purchase Agreement, were in a position to destabilize Quebecor's capital structure.  *See*

Levin Decl. Ex. 9 (Internal Quebecor Mem. dated June 29, 2007).  To lower its debt-to-

capitalization ratio and avoid breaching the Capitalization Covenant, Quebecor initiated a

partial tender offer to the Noteholders on August 3, 2007.  *See* Kaufman Decl. Ex. B2

(Offer to Purchase and Consent Solicitation) (the "Partial Tender Offer").  Under this

---

distinction is immaterial to the legal issue presented by the adversary proceeding and
does not impact this decision.

Partial Tender Offer, Quebecor offered to purchase 50.1% of the outstanding Notes upon

the participating Noteholders' consent to amend the Capitalization Covenant in the Note

Purchase Agreement to raise the permissible debt-to-capitalization ratio from 55% to

65%. *See id.*

On August 15, 2007, the Noteholders executed that certain noteholder cooperation

agreement memorializing their intent to reject the Partial Tender Offer. *See* Levin Decl.

Ex. 13 (the "Noteholder Cooperation Agreement"); Kaufman Decl. Ex. B3 (Letter from

Debevoise & Plimpton LLP, counsel to the Noteholders) (rejecting Partial Tender Offer).

That same day, the Noteholders also entered into that certain right of first refusal

agreement, whereby the Noteholders agreed to provide each holder with a right of first

refusal prior to selling any Notes outside of the then-existing group of Noteholders. *See*

Levin Decl. Exs. 14, 15 (the "Right of First Refusal Agreement").

After the failure of the Partial Tender Offer, QWI's financial condition continued

to deteriorate. On September 28, 2007, QWUSA and QWI entered into an amendment to

the Credit Agreement. *See* Kaufman Decl. Ex. A5 (Fourth Amending Agreement to the

Amended and Restated Credit Agreement). Among other changes, this amendment

immediately reduced the maximum amount available under the credit facility to $750

million, waived any default under the Cross-Default Provision, and permitted Quebecor

to draw on its line of credit under the credit facility for purposes of redeeming the Notes.

*Id.* §§ 2.2, 3.2, 3.4.

That same day, QWCC sent each Noteholder a notice of redemption designating

October 29, 2007 as the date on which it would redeem all outstanding Notes pursuant to

section 8.2 of the Note Purchase Agreement. *See* Kaufman Decl. Ex. B7 (Notice of

12

Redemption dated Sept. 28, 2007) (the "Redemption Notice") ¶1 ("Pursuant to Section 8.2 of each of the Note Purchase Agreements … [QWCC] has called for redemption on October 29, 2007 …").  The Redemption Notice further instructed the Noteholders to mail the canceled Notes directly to QWI's headquarters in Montreal.  *Id*. ¶4 ("Upon your receipt of the Redemption Price for the Notes that you hold … please surrender such Notes for cancellation, pursuant to Section 8.5 of the Note Purchase Agreements, to [QWCC] at the address set forth below:  612 Saint-Jacques Street, Montreal, Quebec, Canada, H3C 4M8 …").

For corporate tax reasons, QWCC thereafter assigned its obligation to make the redemption payment to QWUSA, and QWUSA agreed to "purchase" the Notes and then surrender the Notes to QWCC for "cancellation."  *See* Kaufman Decl. Ex. A6 (Assignment and Assumption Agreement dated as of September 28, 2007) ¶3 ("Purchase and Cancellation of the Notes.  [QWCC] and [QWUSA] agree that upon payment of the Redemption Price by [QWUSA] the Notes will be purchased [by QWUSA] … following the payment of the Redemption Price the Notes will be surrendered to [QWCC] for cancellation pursuant to section 8.5 of the Note Purchase Agreements … ") (emphasis in original).  QWUSA then informed the Noteholders that the "Redemption Price will be paid by [QWUSA] … This will result in the purchase of the Notes by [QWUSA]" and provided the Noteholders with an attached certificate describing its calculation of the Make-Whole Premium.  *See* Kaufman Decl. Ex. B12 (Untitled notice from QWUSA dated Oct. 25, 2007).

On October 29, 2007, the agent under the Credit Agreement wired approximately $426 million to QWUSA's main operating account at Bank of America, N.A. ("Bank of

13

America").  *See id.* Ex. B21 (E-mail chain dated Oct. 29, 2007 between employees of

Quebecor and agent) (confirming wire transfer).  Bank of America then wired

approximately $376 million of this amount to CIBC Mellon Trust Co. ("CIBC Mellon"),

the trustee for the Notes (the "Disputed Transfer").  *Id.* Ex. B13 (Bank of America

internal report recording a transfer of $376,298,061.81 to an account at CIBC Mellon).

CIBC Mellon, in turn, wired to each Noteholder its portion of that amount.  *Id.* Ex. D1

(Transcript of deposition of Roland Ribotti, dated Mar. 24, 2010) (the "Ribotti Dep. Tr.")

210:1-212:21.  The Disputed Transfer consisted of approximately $316 million in

principal, $6 million in accrued interest, and $53 million in Make-Whole Premium.  *Id.*

Ex. B18 (E-mail chain dated Oct. 25, 2007 with employees of Quebecor showing

calculation of accrued interest and Make-Whole Premium).

     The Noteholders subsequently surrendered the Notes by mailing them directly to

QWI's Montreal headquarters.  *See, e.g., id.* Ex. D7 (Transcript of deposition of Peter

Pulkkinen, dated July 10, 2009) 156:15-157:4 (testifying that Deutsche Bank A.G., a

Noteholder, returned the Notes by federal express to "some entity in Canada"); Ribotti

Dep. Tr. 166:1-12.  Although this was a requirement of the transaction, compliance was

lax.  Several Noteholders did not immediately mail the Notes and instead waited days, or

in certain instances, months, before mailing the Notes to Montreal as instructed.  *See,*

*e.g.*, Decl. of Ben Vance in Support of Motion of Defendants for Summary Judgment,

dated Oct. 28, 2010 (Provident Investment Management, LLC), Adv. Pro. 08-01417, ECF

No. 58 ¶ 11 (stating that Notes were not mailed until "on or about" April 4, 2008); Decl.

of Michael Bullock in Support of Motion of Defendants for Summary Judgment, dated

Oct. 23, 2010 (American United Life Insurance Company), Adv. Pro. 08-01417, ECF No. 42 ¶ 11 (stating that Notes were not mailed until "on or about" November 16, 2007).

In the period immediately following the Disputed Transfer, at least some Noteholders expressed concern that a chapter 11 filing by Quebecor could result in the avoidance of the Disputed Transfer as a preferential transfer.  *See, e.g.,* Levin Decl. Ex. 50 (Transcript of deposition of Nicholas Griffiths of Noteholder Barclays, dated Aug. 13, 2009) 161:7-163:15 (recalling conversations with other Noteholders anxious about potential preference exposure); *Id.* Ex. 47 (E-mail chain between Peter Pulkkinen of Deutsche Bank and Michael Bullock of One America Financial Partners, dated Jan. 21, 2008) (expressing concern over potential preference exposure).

## III.    *The Chapter 11 cases*

On January 20, 2008, QWI, QWUSA, and their affiliates filed for protection under the Canadian Companies' Creditors Arrangement Act in the Superior Court in Montreal.  *See* Initial Order, dated Jan. 21, 2008, issued by the Honorable Robert Monjeon, J.S.C. of the Quebec Superior Court of Justice, attached as Ex. B to the Notice of Filing, Case No. 08-10152, ECF No. 31.  The next day, QWUSA and a number of its affiliates filed for protection under chapter 11 in the United States Bankruptcy Court for the Southern District of New York.  *See* Voluntary Petition dated Jan. 21, 2008, Case No. 08-10152, ECF No. 1.

Thereafter, the Committee commenced this action to avoid and recover the Disputed Transfer and disallow the Defendants' claims (as subsequently amended, the "Amended Compl.").  *See* Amended Compl., dated Feb. 10, 2009, Adv. Pro. 08-01417, ECF No. 8 (Counts I-III).  On February 11, 2009, the Court approved a stipulated

protective order between the parties requiring that any discovery material designated as "highly confidential" or "confidential" be filed with the Court under seal.[5] *See* Stipulated Protective Order, Adv. Pro. 08-01417, ECF No. 9, ¶¶ 8-11.  On October 29, 2010, the Defendants filed the Motion under seal pursuant to the stipulated protective order.  *See* Motion, Adv. Pro. 08-01417, ECF No. 34.

After extensive briefing, the Court heard oral argument on the Motion on January 19, 2011 and held a limited evidentiary hearing[6] on May 4 and 5, 2011 (the "Evidentiary Hearing").  Following the Evidentiary Hearing, the parties provided supplemental submissions.  *See* Plaintiff's Post Hearing Mem. in Opp'n to Defendants' Mot. for Summary Judgment, dated June 10, 2011, Adv. Pro. 08-01417, ECF No. 76; Defendants' Post-Hearing Brief, dated June 10, 2011, Adv. Pro. 08-01417, ECF No. 77 (the "Noteholders' Post-Hearing Brief").

On June 28, 2011, after submission by the parties of their respective post-hearing briefs, the Second Circuit issued the *Enron* decision interpreting section 546(e) of the Code in reference to the redemption of commercial paper.  In light of that development,

---

[5] In retrospect, the Court now questions whether the parties truly needed to designate so many of the documents in this litigation as "confidential".  The Court believes that these designations were used here excessively and that it was not necessary to file so many of the pleadings under seal.  The parties are directed to meet and confer with the objective of formulating a further stipulation that will lead to an unsealing of those pleadings that are still subject to the Stipulated Protective Order with such redactions as may be needed to preserve genuine confidentiality concerns.

[6] At the Evidentiary Hearing, the Court heard live testimony from the Committee's expert witness (Professor Jonathan R. Macey), two of the Defendants' fact witnesses (Michael Bullock, Vice President of American United Life Insurance Company and Mark Ponder, Managing Director, Wells Fargo Securities LLC), and the Defendants' expert witness (Christopher T. Nicholls, Senior Managing Director, FTI Consulting, Inc. and FTI Capital Advisors).

at the Court's request, on July 13, 2011, the parties provided additional letter briefs

addressing *Enron* and its impact on the issues presented.

### *Standard*

Summary judgment is appropriate when there is "no genuine dispute as to any

material fact," such that the moving party is entitled to "judgment as a matter of law."

*See* Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, the court must

resolve ambiguities and draw all inferences against the moving party.  *See Coach*

*Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (citations

omitted).  In determining whether to grant a motion for summary judgment, the court is

not to "weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249,

106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

At oral argument on the Motion, the Court determined that the Evidentiary

Hearing should be scheduled to further explore and develop facts and expert testimony

relevant to "the Court's exercise of discretion to construe the term 'settlement payment' …

for purposes of [section] 546(e) [of the Code]."  1/19/11 Tr. 82:6-15 (Peck, J.).  Although

expert witnesses called by the parties offered conflicting opinions as to whether the

Disputed Transfer should be construed as a settlement payment, the facts are not in

dispute, and it is appropriate to determine the legal issues under the summary judgment

standard.

It is appropriate to resolve a dispute over the legal application of a safe harbor

provision in the context of a dispositive motion such as a motion for summary judgment.

*See, e.g., Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009) (affirming a

lower court's granting of summary judgment in a section 546(e) safe harbor dispute).

Indeed, concluding as a general matter that all safe harbor disputes must proceed to trial

would effectively undermine the objective of legal certainty in securities transactions that

motivated Congress' adoption of the safe harbor provisions. *See, e.g., Kaiser Steel Corp.*

*v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir. 1990) (noting that Congress

intended the safe harbor to minimize instability and displacement) (quotation omitted).

### *Discussion*

The Disputed Transfer may not be avoided as a preference because it constitutes a

"settlement payment" made to a "financial institution" as those terms are used within

section 546(e) of the Code. [7]

**I.**    ***Section 546(e) of the Code***

In this litigation, the Committee seeks to avoid the Disputed Transfer as a

preferential transfer under section 547 of the Code.  Section 547(b) provides that the

trustee of a bankruptcy estate may recover, among other things, money or property

transferred by an insolvent debtor in the ninety days preceding bankruptcy, where the

transfer (1) was made to or for the benefit of a creditor; (2) was made for or on account of

---

[7] In addition to being a "settlement payment" exempt from avoidance, the Disputed
Transfer also qualifies as a safe-harbored "transfer made by or to (or for the benefit of) a
… financial institution … in connection with a securities contract, as defined in section
741(7) …"  *See* 11 U.S.C. § 546(e).  Given the comprehensive language used to define
the term "securities contract" in section 741(7) of the Code (*i.e.*, "a contract for the
purchase, sale, or loan of a security…"), the Note Purchase Agreement is a contract that
qualifies as a "securities contract" for purposes of this alternative statutory ground.
Plainly, the Disputed Transfer was made "in connection with" the Note Purchase
Agreement, notwithstanding the Plaintiff's position that the clause should be interpreted
as requiring that a transfer "be made in connection with *the purchase, sale, or repurchase*
[*i.e.,* not the redemption] of a security."  *See* Response pp. 29-33 (emphasis in original).
*Enron* makes clear that the safe harbor applies to redemptions and has destroyed that
argument.  Thus, the Disputed Transfer also is exempt from avoidance under section
546(e) because it is a transfer made in connection with a securities contract.

an antecedent debt owed by the debtor; and (3) enabled the creditor to receive more than

it otherwise would have under the provisions of the Code.  *See* 11 U.S.C. § 547(b).

Section 546(e), for purposes of the Disputed Transfer, carves out a limited

exception to section 547(b):

> Notwithstanding section[] … 547 … of this title, [which
> empowers the trustee to avoid preferential transfers,] the
> trustee may not avoid a transfer that is a … settlement
> payment, as defined in section … 741 of this title, made by
> or to (or for the benefit of) a … financial institution … that
> is made before the commencement of the case …

11 U.S.C. § 546(e).  Section 741(8) defines a "settlement payment" as "a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a

settlement payment on account, a final settlement payment, or any other similar payment

commonly used in the securities trade."  11 U.S.C. § 741(8).

In determining that the transfer in question qualifies for the exemption, the Court

must find that a "settlement payment" has been made to a "financial institution."  Despite

attempts by the Committee to disregard the undisputed involvement of a financial

institution, without question the Disputed Transfer was "made by or to (or for the benefit

of) a … financial institution," *i.e.*, CIBC Mellon as trustee for the Notes.[8]  The greater

---

[8] CIBC Mellon, a "financial institution," was the immediate recipient of the Disputed
Transfer.  *See* Noteholders' Supplemental Brief Concerning the Second Circuit's *Enron*
Decision, dated July 13, 2011, Adv. Pro. 08-01417, ECF No. 80, p.8.  The Committee
argues that CIBC Mellon was a mere "conduit" for funds, however, and that the
Noteholders should be deemed the true recipients for purposes of satisfying the "financial
institution" requirement of section 546(e).  *See* Response pp. 33-36.  The Court rejects
this argument because the plain language of section 546(e) only requires payment to a
"financial institution" without any qualification as to the capacity of that recipient.

analytical challenge involves finding whether the Disputed Transfer properly fits the definition of a "settlement payment" for purposes of section 546(e).[9]

## II.   *Enron resolved significant uncertainty by clarifying the meaning of "settlement payment" for purposes of section 546(e) of the Code*

The uncertainty surrounding the definition of "settlement payment" in section 741(8) of the Code is readily apparent and has been the subject of extensive recent litigation.  Litigants seeking to claim bankruptcy immunities have attempted to ascertain the outer boundaries of these ostensibly broad provisions and have asked courts to construe section 546(e) to insulate from avoidance certain transactions that would appear to fall outside the most obvious boundaries of the Code's safe harbor regime.  *Compare, e.g., QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545 (6th Cir. 2009) (declining to limit section 546(e) to the context of publicly traded securities), *with, e.g., Buckley v. Goldman, Sachs & Co.*, 2005 U.S. Dist. LEXIS 9626 (D. Mass. May 20, 2005) (finding LBO payments outside of the scope of section 546(e)).

A very recent bankruptcy court decision by my colleague Judge Robert Drain reviewed the legislative history of section 546(e) and declined to extend the protection of "settlement payments" to relatively inconsequential private transactions that, if avoided, would have only a modest impact on the broader securities markets.  *See Geltzer v. Mooney (In re MacMenamin's Grill, Ltd.)*, Adv. Pro. 09-8266, 2011 Bankr. LEXIS 1461 (Bankr. S.D.N.Y. Apr. 21, 2011) ("*MacMenamin*").

---

[9] In addition to arguing that the entire amount of the Disputed Transfer is safe harbored from avoidance by section 546(e), the Noteholders also contend that, in any event, approximately $241 million of the $376 million Disputed Transfer is protected from avoidance under the earmarking doctrine.  *See* Motion pp.  25-28.  Because the entire Disputed Transfer is a "settlement payment" for purposes of section 546(e) under the controlling precedent of the majority opinion in *Enron*, it is unnecessary for the Court to address this alternative argument.

In *MacMenamin*, a trustee sought to avoid three payments, each in an amount exceeding $300,000, made to individual owners of a bar and grill as part of a private leveraged buyout.  The shareholder defendants moved for summary judgment, arguing that the payments were exempt from avoidance as "settlement payments" under section 546(e) of the Code.  Judge Drain began by noting that the context of section 546(e) "is in fact tied to the securities markets" and is intended to address the "business of engaging in securities transfers."  *Id.* at *18-20.  Given this context, he concluded that the plain text of section 741(8) was "circular" and "unhelpful" and referred to the legislative history of section 546(e) to better understand the statute's meaning.  *Id.* at *19-20, 30-31.  That legislative history demonstrates that Congress intended section 546(e) to shield from avoidance transfers that involve an "entity in its capacity as a participant in any securities market" or that "pose any danger to the functioning of any securities market."  *Id.* at *31. According to *MacMenamin*, the statutory safe harbor scheme created by Congress aims to reduce systemic risk to the financial markets – an objective that is not threatened by the avoidance of such a small scale private stock transaction.  *See id.* at *13.

Unlike the bankruptcy court in *MacMenamin*, however, the Second Circuit in *Enron* ruled that courts construing section 546(e) need not examine its legislative history in light of its unambiguous plain language.  In that case, the Second Circuit considered whether pre-petition payments made by Enron to retire unsecured commercial paper prior to its maturity were avoidable as preferential transfers.  The payments redeeming the commercial paper were funneled to individual holders through certain broker-dealers via their respective accounts at the DTC.  Enron commenced the adversary proceeding before the bankruptcy court to avoid and recover the redemption payments as preferential and

constructively fraudulent transfers under sections 547 and 548 of the Code.  The

bankruptcy court found that the redemption by Enron of its commercial paper did not fall

within the safe harbor of section 546(e).  *In re Enron Creditors Recovery Corp.*, 407 B.R.

17 (Bankr. S.D.N.Y. 2009).  The district court reversed.  *In re Enron Creditors Recovery

Corp.*, 422 B.R. 423 (S.D.N.Y. 2009).

 On appeal, Enron argued that the redemption payments did not constitute

"settlement payments" protected by section 546(e) because (i) the final phrase of the

definition in section 741(8) encompassing payments "commonly used in the securities

trade" does not apply to unusual redemption payments, (ii) that definition applies only to

purchase-and-sale transactions that, unlike the redemption payments, involve a transfer of

title to securities, and (iii) the redemption payments do not implicate the policy concerns

underlying the safe harbor provisions because the payments were not "cleared" through a

systemically-critical financial intermediary such as the DTC.  *Enron,* 2011 WL 2536101,

at *6.

 The Second Circuit rejected each of these arguments and limited its analysis to

the plain language of section 741(8) of the Code.  First, it concluded that the unique

nature of the redemption payments does not render them ineligible from being

"settlement payments" because "the grammatical structure" of section 741(8) "strongly

suggests that the phrase 'commonly used in the securities trade' modifies only the term

immediately preceding it …"  *Id.* at *6.  Second, the Court declined to adopt a rule

excluding redemption payments from the definition of "settlement payment" under

section 741(8), concluding instead that neither the statute nor case law requires payment

to be made in connection with a purchase or sale.  *Id.* at *7-8.  Third, the Court held that a

payment may qualify for safe harbor protection even if not cleared through a financial intermediary.  *Id.* at *9.

These determinations made by the Second Circuit, taken together, clarify the safe harbor protection available under section 546(e) and resolve uncertainty as to the meaning of the term "settlement payment."  The practical effect of the opinion is to make it more difficult for a plaintiff such as the Committee to maintain a viable cause of action for avoidance in relation to prepetition transfers made to complete a transaction involving a security.  Because the definition of the term "security" in section 101(49) of the Code covers such a long list of debt and equity instruments, the impact of the decision on avoidance actions may be quite far reaching.[10]

### III.   *The Disputed Transfer is exempt from avoidance as a "settlement payment" under section 546(e)*

The *Enron* opinion has significantly influenced the Court's deliberations.  The reasoning adopted by the majority blunts the effectiveness of many of the Committee's legal arguments in opposition to the Motion.  Of particular importance in deciding the Motion is the clarity and consistency that has been given to the term "settlement payment."  The gloss to the meaning provided by the Court of Appeals does not depend upon an examination and interpretation of the legislative history, does not restrict application of this safe harbor provision to purchases and sales of securities and does not require a formal settlement process as advocated by the Committee.  The definition in the Code may be self-referential and circular, but the direction given by the *Enron* majority with respect to that definition is both uncomplicated and crystal clear – a settlement

---

[10] Section 101(49)(B)(vii) excludes from the definition of security "debt or evidence of indebtedness for goods sold and delivered or services rendered."  This means that the decision in *Enron* has no effect on preference litigation involving trade creditors.

payment, quite simply, is a "transfer of cash … made to complete [a] securities transaction."  *Enron,* 2011 WL 2536101, at *9 (quotations omitted).

Under this easy-to-apply formulation, the Court concludes that the Disputed Transfer qualifies for the exemption under section 546(e).  The transaction in question involves three elements that together support this conclusion – (i) the transfer by QWUSA of cash (ii) to a financial institution that was acting as agent for the Noteholders (iii) made to repurchase and cancel securities, *i.e.*, to complete a securities transaction. The first part of the formulation – that the "settlement payment" be a "transfer of cash" – is demonstrated by the wiring of funds from QWUSA to CIBC Mellon.  The second required component, consistent with section 546(e), is that the transfer be made to a financial institution.  This requirement is satisfied by the involvement of CIBC Mellon, a financial institution, in receiving the Disputed Transfer.  The third element is present because the cash was transferred for securities in "completion" of the transaction.

The Notes are expressly defined as securities in the Code.  *See* 11 U.S.C. § 101(49)(A)(i) ("The term 'security' – (A) includes – (i) note …").  The repurchase of the Notes was the means chosen by Quebecor to complete what in essence is the redemption of the Notes.  The transaction, therefore, is comparable to the redemption of commercial paper that occurred in *Enron*.  QWUSA made the Disputed Transfer in connection with the "completion" of a transaction to cancel its own outstanding securities that it both structured and executed.  *Enron,* 2011 WL 2536101, at *7-9 (holding that Enron's redemption of commercial paper constituted the "completion" of a securities transaction).

### A.      *Implicit systemic significance*

The elements of the transaction summarized above do not entail any consideration
of the benefits to the securities markets associated with finding this immunity from
avoidance liability.  In that respect, this is a formula that appears to embrace every
qualifying transfer that completes a securities transaction regardless of any systemic
significance.  Implicit in the *Enron* definition of settlement payment is the concept that
the securities markets are benefited by protecting all settled trades of securities from
avoidance and preserving the finality of these completed trades.

Although it is not necessary to consider the impact of avoidance of a claimed
settlement payment on the securities markets, the Court of Appeals in *Enron* did view the
redemption of commercial paper held by two hundred investors to be a public market
transaction with the potential to be systemically significant.  For that reason, the opinion
includes the comment that the result would have been the same even if the Court had
taken into consideration Congressional intent in enacting this safe harbor.  *Enron,* 2011
WL 2536101, at *9.  This context (*i.e.*, the recognition that the transaction in question fits
within the spectrum of systemic consequences) is not an essential part of the holding of
the Second Circuit.

Accordingly, even though the legislative history points to the policy objective of
protecting the securities markets, a transfer will still qualify for exemption from
avoidance under the language of section 546(e) without having to show anything more
than that the transfer in question was made to a financial institution to complete a
securities transaction.  Thus, while systemic significance may have been implicit in the

facts presented to the *Enron* court, this Court does not need to consider context or to find an impact on the securities markets in applying the *Enron* definition.

Even though an examination of context and market impact is not required, the Court is satisfied that the payments made by QWUSA to the Noteholders come within both the letter and spirit of the exemption and that systemic consequences could be demonstrated if that were necessary.  The Noteholders were participants in a secondary market in which private placement investments regularly traded.  They impacted that market by entering into the Noteholder Cooperation Agreement and the Right of First Refusal Agreement that constrained their trading in the secondary market in connection with the proposed redemption of the Notes.  Moreover, Quebecor itself at the time of the Disputed Transfer was a vast multi-national, multi-billion dollar business enterprise and was the second-largest commercial printer in North America with significant operations in Europe.  Its customers included many of the world's largest publishers of magazines and catalogues.  Although not a financial participant itself, Quebecor was large enough to be a source of significant financial exposure to its lenders, the Noteholders and other financial counterparties.

Congress enacted section 546(e) "to minimize the displacement caused in the commodities and securities markets in the event [of] a major bankruptcy affecting those industries," and "to prevent the ripple effect created by the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected industry."  *Official Comm. of Unsecured Creditors v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76 (Bankr. E.D.N.Y. 2007) (citations and internal quotation marks omitted).  That policy continued to motivate the 2006 Amendments to

section 546(e), which aimed to "help reduce systemic risk in the financial markets."

H.Rep. 109-648 (Part I) at 1.

From the perspective of Quebecor, the repurchase of the Notes was part of a survival strategy calculated to prevent a breach of the Capitalization Covenant contained in the Note Purchase Agreement.  Any breach of the Capitalization Covenant, in turn, could have led to the acceleration of the maturity of the Notes and a corresponding breach of the Cross-Default Provision in the Credit Agreement.  In short, Quebecor made the Disputed Transfer at a time when it had limited options to forestall the collapse of its entire capital structure.  While not systemically significant in the sense of protecting the financial markets, the Disputed Transfer was a significant transaction that benefited Quebecor and helped it to achieve financial stability for a period of time and was also most significant from the perspective of the Noteholders who received hundreds of millions of dollars in exchange for their Notes.

Given the sheer size of the transaction with the Noteholders, the repurchase by Quebecor of its private Notes more closely resembles the public commercial paper redemptions considered by the Court of Appeals in *Enron* than the small, private transfer considered in *MacMenamin*.  The Noteholders themselves, a group primarily consisting of large financial institutions, are customary participants in the secondary market for private placement notes in which holdings routinely are traded from one institution to another.[11]  This market is unregulated but still active and systemically significant in its

---

[11] It is instructive, although not dispositive, that some of the Noteholders, as experienced participants in the market for private placement notes, considered the Disputed Transfer to be an unscheduled "settlement."  *See, e.g.*, 5/4/11 Tr. 32:5-7 (Bullock); *Id.* at 108:24-109:12 (Ponder).  The expectations of market participants such as the Noteholders are important factors in determining the scope of activity that should be protected by the safe

own right.  The Disputed Transfer is not a secondary market transfer between institutions, and any impact on this market from avoiding the Disputed Transfer is speculative and hard to quantify.  However, regardless of any measurable market impact that may be shown, the scale of the repurchase by Quebecor of the private Notes necessarily places the Disputed Transfer in a category that differs from the one discussed by Judge Drain in *MacMenamin* and brings it more closely into alignment with the commercial paper transactions considered by the Court of Appeals in *Enron*.  The Disputed Transfer is sufficiently material in amount as to be potentially significant from a systemic point of view, and avoiding a transaction such as this conceivably could impact the original issue or secondary markets for private placement indebtedness.

However, not all transfers that fit the *Enron* definition of a settlement payment involve this much money or a business enterprise of such obvious importance in its relevant market.  One of the challenges in applying the *Enron* holding on a case-by-case basis is that the definition may extend protection to transfers that Congress never intended to immunize and may lead to unintended consequences.  Because the pronouncement regarding the definition of settlement payment is so general in its application (as noted by the dissent with reference to the impact on recovering preferential payments of unsecured loans), does not advert to Congressional intent (except to say that to do so would not change the result) and applies to any qualifying transfer, even one with no demonstrated connection to the securities markets (*e.g.*,

---

harbor provisions of the Code, including section 546(e).  *See* 1/19/11 Tr. 16:11-18 (Peck, J.) (Safe harbors "are to function in part based upon the way in which market participants would expand a definition through practice").

*MacMenamin*), the difficult question becomes how properly to draw the line as to those transfers that should and should not be exempt from avoidance.

Under the *Enron* construction of the term settlement payment, every transfer of cash to a financial institution for a security to complete a securities transaction within ninety days prior to commencement of a bankruptcy filing is exempt from avoidance liability, even, it seems, a transfer such as the one at issue in *MacMenamin*.  Implicit in this formulation is the unstated premise that an unwinding of the transaction will negatively impact the securities markets.  Additional cases regarding the extent and scope of the 546(e) exemption may lead to further clarifications regarding the scope of this safe harbor provision, particularly in instances involving relatively small private transactions having no foreseeable impact on the securities markets.

**B.      *Comparing the Circumstances in Enron with those in Quebecor***

Given the general application of the *Enron* holding discussed above, the differences in settlement procedures that distinguish the repurchase of the Notes from the commercial paper redemption in *Enron* are no longer meaningful factors in deciding the Motion.  Nonetheless, the Court will address these differences.

Quebecor and Enron followed different procedures when transferring cash for securities.  *See* Plaintiff's Supplemental Brief, dated July 13, 2011, Adv. Pro. 08-01417, ECF No. 79.  Quebecor, for its part, wired the Disputed Transfer directly to the trustee for the Noteholders without involving any clearing agency or formal settlement system.[12]  In

---

[12] Notwithstanding the Noteholders' arguments to the contrary, the role of CIBC Mellon as trustee for the Notes does not resemble that of a true intermediary for purposes of exposure to settlement risk.  *See* Noteholders' Post-Hearing Brief pp. 5-6 (the Disputed Transfer "was made to CIBC Mellon … in its capacity as an intermediary…"); *Id.*  at 21 ("[CIBC Mellon] performed services for the Noteholders similar to those of a clearing

that respect, the repurchase of the Notes did not implicate traditional notions of settlement risk. The Noteholders received payment regardless of the timing of delivery of their Notes for cancellation. The commercial paper redemption in *Enron*, on the other hand, involved brokers and the DTC acting as an intermediary or conduit to facilitate the settlement of trades by approximately two hundred separate investors in the commercial paper market.

The Committee repeatedly has stressed these factual differences in its briefs and at the Evidentiary Hearing. The Committee's expert witness, Professor Jonathan Macey of Yale Law School, examined the process followed by Quebecor to repurchase its Notes and expressed the opinion that (i) there was no settlement risk involved in this process and (ii) the payments in question were not settlement payments as understood within the securities industry. He stated that central clearing agencies typically are engaged in settling securities trades to reduce systemic financial risk inherent in securities transactions between counterparties. *See* 5/5/11 Tr. 56:4-8 (Macey) (centralized clearing agencies evolved to reduce "the risk that somebody will buy securities and pay their money, and the securities will never show up, or vice versa, someone will deliver the securities and the money won't show up"); *Id.* at 58:13-15 (Macey) ("the more that settlement can become centralized, the more we can reduce systemic risk").

As explained by Professor Macey, the use of the term "settlement payment" in section 546(e) of the Code describes the "process," usually occurring through a central

---

agency"). The commercial reality is that CIBC Mellon simply received the wire transfer in its capacity as trustee and then made individual payments to each Noteholder. CIBC Mellon dealt solely with the cash side of the transaction and had no role with respect to the Notes that were to be surrendered by the Noteholders to Quebecor for cancellation.

intermediary such as the DTC, by which "securities are delivered against payment in connection with a securities transaction."[13]   According to Professor Macey, such a "settlement process" is an essential component of a "settlement payment" because the process essentially serves to mitigate the same risk that led to the adoption by Congress of the safe harbor in the first place, namely, the risk that a party to a securities transaction could fail to receive the benefit of its bargain.   *See* 5/5/11 Tr. 55:23-56:22 (Macey).

In the wake of *Enron*, however, such arguments that seek to categorize the Disputed Transfer as something other than a "settlement payment" on the basis of an unusual or atypical delivery process are no longer persuasive.   Simply put, Professor Macey's views on the subject have been superseded by the majority opinion in *Enron* that relies on the plain language of the Code and explicitly rejects the position espoused by the Committee that a transfer may only qualify as a "settlement payment" if it passes through a financial intermediary serving as a clearing agency.   *See Enron,* 2011 WL 2536101, at *9.   In so ruling, the Second Circuit agreed with several recent decisions by other Courts of Appeals that addressed the issue.   *Id.* at *9; *Brandt v. B.A. Capital Co. L.P. (In re Plassein Int'l Corp.),* 590 F.3d. 252, 257-59 (3d Cir. 2009) (holding that a transfer in connection with a private leveraged buyout was a "settlement payment"

---

[13] 5/5/11 Tr. 55:18-22, 57:15-20 (Macey).   Macey's testimony was consistent with his prior testimony as an expert on behalf of defendant Goldman, Sachs & Co. in *In re Enron Creditors Recovery Corp.*, 407 B.R. 17 (Bankr. S.D.N.Y. 2009), *rev'd*, 422 B.R. 423 (S.D.N.Y. 2009), *aff'd Enron*.   In that case, Macey testified that a series of payments from Enron to Goldman constituted "settlement payments" for purposes of section 546(e).   The Noteholders have criticized Macey's testimony in the present litigation as being inconsistent with his prior testimony in *Enron*.   *See* Noteholders' Post-Hearing Brief p. 16.   As Macey explained at the Evidentiary Hearing, however, the transfers in *Enron* were "settlement payments" because, unlike the Disputed Transfer, he understood them to involve a classic "delivery versus payment" settlement structure.   5/5/11 Tr. 70:5-71:12 (Macey).   Under the *Enron* holding "delivery versus payment" may be part of the structure of a settlement payment but is not a requirement.

notwithstanding lack of a true "settlement process" involving a clearinghouse intermediary); *In re QSI Holdings, Inc.*, 571 F.3d at 549-50 (6th Cir. 2009) (same); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985-86 (8th Cir. 2009) (same).

The cumulative effect of this consistent circuit authority is to remove from consideration any mandated set of procedures or participants and to focus instead on applying the literal language of the statutory exemption to the facts presented. Departures from certain common settlement procedures in the securities industry (*e.g.*, the absence of an intermediary) are not critical provided that the transfer at issue satisfies the definition of a settlement payment that completes a securities transaction.

### *Conclusion*

The ruling in *Enron* effectively eliminates the need for any inquiry into the legislative history of section 546(e) or close attention to any distinguishing circumstances relating to settlement risk associated with the Disputed Transfer.  Stripped to its most essential facts, the Disputed Transfer involved the "completion" of a securities transaction by Quebecor in which the Notes were repurchased and canceled (effectively redeemed) and cash was paid to a single financial institution as paying agent for the Noteholders with the proceeds to be subsequently distributed to each of them.  Such a transfer fits the definition of a "settlement payment" and is protected from avoidance by section 546(e) of the Code.  Therefore, the Motion is granted, and counsel for the Noteholders is directed to submit an order consistent with this decision granting the Motion and entering judgment in favor of the Defendants.

Dated: New York, New York
    July 27, 2011                                    *s/ James M. Peck*
                                                  Honorable James M. Peck
                                                  United States Bankruptcy Judge